[Civ. No. 12789. First Dist., Div. Two. Jan. 7, 1946.]

Z. GHIOZZI, Respondent, v. CITY OF SOUTH SAN FRANCISCO, Appellant.

J. W. Coleberd for Appellant.

Frank V. Kington for Respondent.

GOODELL, J.—This is an appeal from a judgment for $2,245 after a trial by the court without a jury.

The respondent sued for $2,245 damages arising out of the flooding of a piece of land on which he raised vegetables. On March 1, 1941, a flood covered this property with sand and debris to a depth of from six inches to about four feet, destroying the crop and damaging the irrigation system and pump.

Colma Creek and Baden Creek have their sources in the mountains lying between San Francisco Bay and the ocean and flow in a general easterly direction through South San Francisco and thence into the bay. They have always carried a large quantity of silt, depositing it over the lower area. Both creeks in a state of nature meandered considerably and frequently overflowed their banks. In 1936 the city constructed two canals to carry the waters of these creeks. The larger one, called Colma Creek Canal, runs in a straight course in a general northwesterly-southeasterly direction and is intersected by a smaller one, called Baden Creek Canal, which runs in a general northeasterly-southwesterly direction, and forms an angle of approximately 60 degrees with the Colma Creek Canal at their confluence. Both canals are lined with masonry and carry most of the water of the two creeks. Before they were built Colma Creek was about 600 feet distant from the Ghiozzi place and Baden Creek flowed across its southerly end. The construction of the canals brought the waters of both creeks right up to the Ghiozzi place, for the Colma Creek Canal runs for about 500 feet along its entire northeasterly boundary line and the Baden Creek Canal runs along its entire northwesterly boundary line, the junction of the two canals being at the northwesterly corner of the property.

During the winter of 1940-41 there were heavy rains, and

large quantities of silt were washed down and lodged in both canals, choking them and retarding the flow of water. In the latter part of February, 1941, the situation had become serious and on the 28th, Urban S. Marshall, the appellant's city engineer, had a crew of seven or eight men working night and day, placing sand bags, timbers and brush on the banks of the canals, and operating a drag-line dredge which was digging sand and debris out of Colma Creek Canal and throwing it on the northerly embankment—toward the town proper. A witness for the appellant testified that Baden Creek Canal (in which the dredge did no work) was full of sand, clay and mud, tin cans, boards "and everything," which debris came up to the top of the embankments, three or four feet above the surrounding land. He also testified that the reenforcement was being done "to keep from flooding the town."

The city engineer kept a diary in which he noted, before this overflow, several places where the water had overrun the banks. Thereafter he entered in his diary "And floods several acres of Ghiozzi's land which was already partially flooded from rainfall only." He took photographs on March 1, one of Colma Creek Canal showing Ghiozzi's pump-house "just before it flooded," and another showing the junction of the two canals "just after the flood, or during the flood." He testified that the flood came out of the south side of Baden Creek Canal "over a distance of about 150 feet from the junction . . . up stream about 150 feet."

The respondent himself worked in the emergency crew. The city engineer testified as follows: "On the first day he, Mr. Ghiozzi, worked there, the day after the big storm, I saw we were not going to be able to hold the water within the confines of the channel of Baden Creek, and I said to him, 'I think your pump house is going to get flooded . . . I will give you some men and we will go down and get your pump out. We will put some sacks in the well, so the sand won't go down in the well.' He said he wasn't interested. . . . A little later, so the pump wouldn't be short-circuited, . . . I cut the electric wire that fed the pump." On cross-examination he admitted that he thought there was going to be sand in the place and that there was a likelihood the pump would be covered.

The appellant contends that no liability on its part because of negligence or on any other ground, has been established,

and, further, that the claim filed with the city by the respondent was wholly insufficient.

The respondent contends that no claim was required in this case for the reason that the city is responsible under the doctrine of inverse eminent domain.

As already appears, these canals do not follow the lines of the natural channels of the two creeks. The city built the canals to protect itself, its inhabitants, and the property within its borders, from damage by the two creeks in times of high water. That such improvements constitute a public purpose cannot be gainsaid. It is true the canals were built in 1936 and the respondent suffered no damage until March 1, 1941, but the damage which he then suffered was a direct consequence of the construction of the artificial waterways both of which were built for the benefit and protection of the municipality.

The case falls within the doctrine of *Elliott* v. *County of Los Angeles,* 183 Cal. 472 [191 P. 899] and *Pacific Seaside Home* v. *Newbert Protection District,* 190 Cal. 544 [213 P. 967], both of which are followed in *House* v. *Los Angeles etc. District,* 25 Cal.2d 384, 389 [153 P.2d 950]. The general principle which they announce was restated in *Powers Farms, Inc.* v. *Consolidated Irr. District,* 19 Cal.2d 123, 126 [119 P.2d 717], as follows: "It is well settled that damage to land caused, with or without negligence, by the seepage of water from canals of an irrigation district which have been constructed and are maintained to supply water for public use, gives the owner of such land a cause of action in the nature of eminent domain against the district." Among the cases there cited are *Massetti* v. *Madera Canal & Irr. Co.,* 20 Cal. App.2d 708, 715 [68 P.2d 260], an overflow case, and *Tormey* v. *Anderson-Cottonwood Irr. Dist.,* 53 Cal.App. 559 [200 P. 814], where, in denying a hearing (p. 568) the Supreme Court reaffirmed the rule that a property owner's right to recover is secured "by the constitutional provision that private property shall not be damaged for public use (Art. I, sec. 14)." See, also, cases collected in the concurring opinion of Justice Traynor in the House case, *supra,* 25 Cal.2d at 393-398.

"But the fact that the cause of action is one of that kind does not exclude it from the operation of a claim statute, the terms of which are broad enough to embrace it. Although the Constitution grants the right to compensation, it does not

specify the procedure by which the right may be enforced. Such procedure may be set up by statutory or charter provisions, and when so established, a failure to comply with it is deemed to be a waiver of the right to compel the payment of damages" (*Powers Farms, Inc.* v. *Consolidated Irr. Dist., supra,* citing numerous cases).

The statute (Stats. 1931, p. 2475, § 1; Deering's Gen. Laws, 1944, Act 5149) requires the filing of a verified claim within ninety days after the accident specifying "the name and address of the claimant, the date and place of the accident and the extent of the injuries or damages received."

■ The claim herein was filed within ninety days; it was verified; it stated the respondent's name and address, and it specified the damages. The only respects in which the appellant claims it failed to respond to the call of the statute is that it did not state the date and place of the occurrence.

The claim does not purport to state either the date or the place, and the respondent does not contend that it does so. His position is that no claim at all is required in a case such as this, where the right to damages is based entirely upon the constitutional provision.

That the city knew the time and place of the damage clearly appears from the undisputed facts already summarized. The day before the flood the city engineer foresaw just what happened, and the day after the flood he measured three feet of sand at the respondent's pump-house. It is difficult to imagine a case presenting stronger evidence of actual knowledge than this case presents. If, as said in *Knight* v. *Los Angeles,* 26 Cal.2d 764, 767 [160 P.2d 779], the purpose of the statute is "to provide the city with information in order that it may settle claims of merit without litigation" and "where there is continuing damage to give the city an opportunity to provide against the continuance of the injury" then certainly in this case the city was not harmed by the failure of the respondent's claim to state the time and the place, for the city already had first-hand, accurate and comprehensive knowledge.

However this may be, the authorities seem to require substantial compliance with the statute even in the face of actual knowledge. In the Powers case *supra* at page 130 the court said:

"The district is not estopped to invoke the requirement for the filing of a verified claim by reason of the fact that it

had timely notice of the danger to plaintiff's property derived from written and oral communications with plaintiff concerning the damage. It is well settled that written notice to or actual knowledge on the part of public officers does not constitute a substantial compliance with or satisfaction of a statutory requirement for a verified claim, or give rise to an estoppel to assert the defense. The long established rule in this state is that the courts may allow no exceptions to the plain provisions of a claim statute under the guise of interpretation or construction. Compliance with the statute is mandatory and the requirement may not be waived." (Citing numerous cases.)

A few days after the decision of the Powers case, the Supreme Court handed down its decision in *Hall* v. *Los Angeles,* 19 Cal.2d 198 [120 P.2d 13]. In that case the claim failed to state the place where the accident occurred. Such failure was held to be fatal to a recovery. The court said (p. 202) : "In the present case, however, there is an entire failure on the part of the plaintiff to comply with one of the mandates of the statute. Substantial compliance cannot be predicated upon no compliance. A contrary holding would permit a claimant to bring suit against a city on the basis of a claim that included none of the information required by the statute if he offered to show that the city acquired the information independently of the claim. Such a holding would emasculate the statute. The present case is governed not by the doctrine of substantial compliance but 'by the principles enunciated in *Cooper* v. *County of Butte, supra* [17 Cal.App.2d 43 (61 P.2d 516)], and *Spencer* v. *City of Calipatria,* 9 Cal.App.2d 267 [49 P.2d 320]. In each of these cases it was held that the filing of an unverified claim is not a substantial compliance with the requirements of the statute. The failure to state the place of the accident is as serious a defect as is the failure to verify the claim. . . .' "

Among the many cases cited in *Powers Farms, Inc.* v. *Consolidated Irr. Dist., supra,* is *Young* v. *County of Ventura,* 39 Cal.App.2d 732 [104 P.2d 102], the facts of which are quite similar to those in the instant case. There the claim was not filed within the ninety-day period, but was presented about nine months after the damage. The delay was held to be fatal to a recovery. In that case the appellant made the same argument as the respondent makes in this, namely, that as his right to damages was derived from the Constitution it

was not necessary for him to present any claim. That contention however was rejected by the court.

Under the authorities to which reference has been made we are constrained to hold that the filing of a claim by the respondent stating the time and place of his damage was a condition precedent to the maintenance of this action.

The judgment is reversed.

Nourse, P. J., concurred.

A petition for a rehearing was denied February 6, 1946, and respondent's petition for a hearing by the Supreme Court was denied March 6, 1946. Carter, J., Traynor, J., and Schauer, J., voted for a hearing.